| | | |
|---|---|---|
| ARLESTER EL JONES, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| Vs. | ) | **MEMORANDUM** |
| | ) | **OF DECISION** |
| DOLE FOOD COMPANY, INC.; DOLE | ) | |
| FRESH VEGETABLES, INC.; KAROL | ) | |
| DEWITT; and TOM LEASE, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the court on review of defendants' Motion for Summary Judgment (#69). In accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), this court entered an Order (#71), advising plaintiff, who is proceeding *pro se*, of his obligations in responding to that motion and allowing him time within which to file his response and supporting affidavits and/or other evidence. While plaintiff filed a response within the time allowed, such has not been supported by admissible affidavits, declarations made under penalty of perjury, or any deposition excerpts that could satisfy his responsive burden under Rule 56, Federal Rules of Civil Procedure. Thus, plaintiff's response is based on his own conclusory allegations, many of which are contrary to his own sworn deposition testimony as thoroughly outlined in plaintiffs' Reply (#76), pp. 3-7. Even if such response had been submitted as a verified pleading, the court, for the reasons that follow, could not find that a genuine issue of material fact has been raised that would warrant trial.

The court also has before it plaintiff's Surreply (#78), which was filed without leave of court, which is beyond the pleadings allowed under Rule 7.1, Federal Rules of Civil Procedure. Defendants have objected to such filing. Objection (#81). Inasmuch as plaintiff

is proceeding pro se, the court will not strike such pleading as defendants have thoroughly argued all issues.

Finally, a non-evidentiary hearing was conducted on October 5, 2011, at which defendants were represented by counsel and plaintiff appeared and ably argued on his own behalf. As discussed at the conclusion of the hearing, the court has read each previous Order of this court concerning discovery in light of the issues raised on summary judgment and at the hearing. In sum, the court allowed defendants to subpoena plaintiff's work record from his new employer and entered a Protective Order prohibiting use of such documents outside this litigation; compelled plaintiff to attend his own deposition; and entered a Protective Order providing defendants relief from answering 440 interrogatories (including sub parts) plaintiff propounded as being in excess of the 20 interrogatories allowed by the Pretrial Order. While plaintiff alleged at the hearing that the court had prevented him from taking discovery, that argument is not supported by the record. Clearly, plaintiff had exactly the same opportunity for discovery that defendants had as discovery for all parties was governed by the same provisions of the Pretrial Order (#15) and the Federal Rules of Civil Procedure. While plaintiff argued that there were employment records of other employees that he wanted and never received, review of the record does not reveal that plaintiff ever moved to compel defendants to answer or produce materials that were properly requested, i.e., contained within a request for production that did not exceed 20 requests. While the court understands that *pro se* litigants are ham-strung by lack of legal training and funding, plaintiff never deposed the decision makers in this Title VII action. As discussed below, it is the perception of the decision maker that is pivotal in determining whether the Civil Rights laws of the United States have been violated, not the perception of the employee. While district courts must liberally construe *pro se* complaints, courts cannot act as the *pro se*

plaintiff's advocate. <u>Gordon v. Leeke</u>, 574 F.2d 1147, 1151 (4th Cir. 1978) (recognizing that district courts are not expected to assume the role of advocate for the *pro se* plaintiff). <u>See also Brock v. Carroll</u>, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); <u>Beaudett v. City of Hampton</u>, 775 F.2d 1274, 1278 (4th Cir. 1985).

## FINDINGS AND CONCLUSIONS

### I.    Discovery Issues Impacting Summary Judgment

While the court will not fully recite the difficulties encountered in discovery, the court notes that the court compelled plaintiff to sit for his own deposition. Despite prior requests for production, plaintiff revealed for the first time during his deposition that he had secretly tape recorded several private conversations with the corporate defendant's management, including Defendants Lease and DeWitt.   He also disclosed he had other documents involving his claims and that he had not produced those documents in discovery or identified them to defendants' counsel.  <u>See</u> Pl. Dep. 59-67 and Defendant's counsel's June 30, 2011 letter to Jones, Ex. 7 to  plaintiff's Memorandum in Support.  Plaintiff only produced one tape, which defendants state was unintelligible. Attached to plaintiff's response is an index he created as what he represents is on those tapes; however, plaintiff has not produced the tapes, he has not had the tapes transcribed by a  court reporter and provided that transcript to his opponents, and he has not had the contents of the tape, the index, or any transcript if such exists authenticated in any manner.   As such, they are inadmissible and to the extent they were not produced as required, they are excludable as provided by Rule 26, Federal Rules of Civil Procedure.

### II.    Factual Background

As defendants' version of events is both supported by admissible evidence of record

and unopposed by any admissible evidence, the court adopts the factual background provided by plaintiffs in their Memorandum in Support (#70). Such factual background is summarized below to aid both the decision-making process and further review.

## A.    Factual Overview

Plaintiff, an African-American male, was an hourly employee of defendant Dole Fresh Vegetables, Inc. (hereinafter "Dole"),[1] at a facility in Ohio in June 2006 when he was notified that, beginning in September 2006, he would be promoted to work as a Warehouse Supervisor in Dole's Bessemer City, North Carolina.[2] Defendant Tom Lease recommended plaintiff for this promotion and Mr. Lease became plaintiff's supervisor in the new North Carolina facility. Plaintiff was initially compensated by an annual salary of $45,000.00 and received a number of pay increases from Mr. Lease throughout his employment. Two years after being promoted, on September 24, 2008, plaintiff's position as supervisor was terminated by Mr. Lease.

It is undisputed that throughout plaintiff's tenure as a supervisor, Mr. Lease remained his immediate supervisor. Equally, it is undisputed that Mr. Lease also selected another African-American male, Craig Roberts, as a warehouse supervisor in 2006. During 2006 and 2007, plaintiff received no "adverse actions" or other corrective disciplinary actions as a warehouse supervisor, no losses in pay, and no demotion or change in his job responsibilities. Further, it is undisputed that Mr. Lease recommended plaintiff for a merit pay increase in 2007 and again in 2008, a few months before his employment was terminated.

_____

[1]     Defendants have unequivocally shown that Dole Fresh Vegetables, Inc., and not Dole Food Company, Inc., was plaintiff's employer at all times relevant to this action.

[2]     Plaintiff argued at the hearing that he was entitled to be compensated at a supervisory pay level, rather than an hourly wage, for the two months of on-the-job training he received while still in Ohio. No evidence of record supports such contention.

Plaintiff's employment problems, however, commenced in early 2008. On January 9, 2008, plaintiff received a written warning following Dole's investigation of an hourly employee's complaints against him of sexual harassment. While plaintiff received a written warning, there were no adverse consequences such as a pay reduction or any change in job or status. Even after such warning, and after plaintiff filed a charge of discrimination against Dole based on such warning, Mr. Lease recommended plaintiff for a merit increase of more than $900, which he received along with a good mid-year 2008 performance review by Lease.

While plaintiff has called into question actions of Dole and others from 2006 forward, the events pivotal to this Title VII action arose or came to fruition in September 2008. During that month, Mr. Lease received a copy of an email plaintiff sent to an hourly employee, who worked in the same shipping department as plaintiff. It is undisputed that such email confirmed, at least in the mind of plaintiff's employer, that plaintiff and the female employee had a long running romantic relationship, which the company believed was contrary to Dole policy for its supervisors, and which lead plaintiff's supervisor to believe that plaintiff had lied about the existence of the relationship. After investigating the circumstances involving plaintiff's violation of Dole policy, Mr. Lease terminated plaintiff's employment in September 2008.

**B.    Undisputed Facts**

**1.    June 2006: Plaintiff is Promoted to Supervisor**

Dole opened its new facility in Bessemer City in the fall of 2006. In mid-2006, Mr. Lease began hiring individuals to fill four supervisory positions for the new Dole warehouse, all of whom would be direct reports to Mr. Lease in the shipping department. Lease Aff. ¶ 3. Of the four supervisors, plaintiff was one of two African-Americans selected, with the

other two supervisors being Hispanic and Caucasian, respectively. <u>Id.</u> ¶ 5. Plaintiff was the only supervisor selected from within the company and also the only supervisor without prior warehouse management experience. <u>Id.</u> ¶ 4; Pl. Dep. 225, Ex. 22. Each of the other successful candidates had ten or more years experience in warehouse supervision. <u>Id.</u> ¶¶ 3 & 5.

### 2. September 2006: Starting Salaries are Determined

As far as starting pay, it is undisputed that plaintiff received a starting salary of $45,000.00, which was less than the starting pay offered to the Hispanic and Caucasian supervisors. It is equally undisputed, however, that Dole's human resources department sets starting pay for each employee (DeWitt Aff. ¶ 11; Pl. Dep. 226) and that individual salaries may vary based on an individual's previous relevant work experience. DeWitt Aff. ¶ 11.

A warehouse supervisor's salary, for example, will normally be based on that individual's warehouse management experience. <u>Id.</u> It is equally undisputed that when a supervisor is hired from outside of Dole, Dole takes the outside applicant's prior salary into consideration when setting an individual's salary to provide an incentive for the applicant to leave their current employment and join Dole. <u>Id.</u> On the other hand, when a current Dole employee is promoted from an hourly position to a salaried supervisor job, Dole does not have to "compete" with another employer based on compensation. <u>Id.</u> Supervisors hired from outside Dole are frequently offered slightly higher salaries than hourly Dole employees promoted to supervisor from within the company with less supervisory experience. <u>Id.</u>

Plaintiff's 2006 starting salary, with no warehouse management experience, was $45,000 per year. DeWitt Aff. ¶ 12; Pl. Dep. 226. The Caucasian male's starting salary, with 22 years experience, was $53,000 per year. DeWitt Aff. ¶ 15. The other African-American male's starting salary (Mr. Roberts), with 10 years experience, was $41,000 per year. <u>Id.</u>

The Hispanic male's starting salary, with 33 years experience, was $50,000 per year.

### 3. Early 2007: Meeting Concerning Dole's Non-Fraternization Policy

While plaintiff argued at the hearing and in his response to the contrary, the admissible evidence presented shows that there is no dispute that Dole's shipping department supervisors have supervisory authority over all lower level employees in the department. Lease Aff. ¶ 7; Roberts Aff. ¶ 7; Pl. Dep. 195-197. Further, "A" shift supervisors may be required to supervise "B" shift employees. Lease Aff. ¶ 7; Roberts Aff. ¶ 7; Pl. Dep. 195-197. This often occurs when, for example, one of the "A" shift supervisors leaves early, or if "B" shift employees arrive early. Lease Aff. ¶ 7; Roberts Aff. ¶ 7; Pl. Dep. 195-197. This will also occur when a supervisor from one shift substitutes for a supervisor on another shift. Id. While plaintiff argued he had no authority over employees on other shifts, he testified as follows:

> A. If Mr. Burgess - - if the supervisor for that shift was not there and Mr. Burgess had responsibility for that shift, then, yes, Mr. Burgess would have the opportunity or the right to direct employees.
>
> Q. And all other warehouse supervisors would have that same right?
>
> A. Under the same circumstances, yes.
>
> Q. And also the same warehouse supervisors, if some employee on another shift didn't do something they were directed to do, could recommend discipline for them?
>
> A. Under the same circumstances, yes.

Pl. Dep. 197. While it is clear that the policy was never written down and apparently evolved as plaintiff questioned its applicability to him, Dole has shown that it *perceived* that it had a policy that prohibits supervisors from having personal *romantic* relationships with hourly employees in the same department and that such had been communicated to plaintiff. Lease Aff. ¶ 8; Roberts Aff. ¶ 8; DeWitt Aff. ¶ 8; Pl. Dep. 215-216, Ex. 10.

Defendants have also shown that such policy does not prohibit supervisors from dating employees in other departments. Thus, if a supervisor is dating or interested in dating an employee in the same department, Dole then can avoid potential conflicts by possibly transferring one of the employee to a different department. Lease Aff. ¶ 8; DeWitt Aff. ¶ 8. According to defendants, plaintiff was aware of this alternative. Lease Aff. ¶ 12. Mr. Lease enforced Dole's policy for supervisor/employee dating in the shipping department. For example, after he learned that a "lead" shipping department employee had a romantic relationship with a lower-level shipping department employee (both of whom were Caucasian), Mr. Lease told them that if they wished to continue dating each other, then one of them would have to transfer to a different department. Lease Aff. ¶ 8. One of the employees was transferred to a different department. Id. Plaintiff testified that he knew about this transfer. Pl. Dep. 191.

In early 2007, Mr. Lease held a meeting with the warehouse supervisors to inform them about Dole's policy prohibiting Warehouse Supervisors from having a personal relationship with employees in the shipping department. Roberts Aff. ¶ 8. Plaintiff was at this meeting. Id. According to the affidavit of Mr. Roberts, plaintiff was aware of the policy as he discussed it with warehouse supervisor Craig Roberts as Mr. Roberts averred. Id.

           **4.**    **August 2007: Plaintiff Questioned by Mr. Lease Concerning the No-Fraternization Policy**

In August 2007, Mr. Lease heard reports from shipping department employees that plaintiff was romantically involved with J. H.,[3] a shipping department forklift operator.

---

[3] To protect the privacy of individuals not party to this lawsuit, the court has eliminated, where possible, and otherwise minimized use of non-party names, especially where the allegations concern interpersonal relationships and employee compensation. While defendants have liberally and quite properly used such names in their pleadings, it is unlikely that such pleadings, unlike court decisions, will become part of a more widely distributed publication.

Lease Aff. ¶ 11. Specifically, employees told Mr. Lease that plaintiff and J. H. scheduled vacation for the same time, were often seen talking in the parking lot together, and were observed flirting with each other. Id. The employees who reported these incidents to Mr. Lease also complained that plaintiff showed J. H. more favorable treatment and that he would retaliate against any male employee who became close to J. H. Id.

After receiving these reports, Mr. Lease met with plaintiff to discuss the reports with him. Pl. Dep. 141-143; Lease Aff. ¶ 12. Mr. Lease asked plaintiff if he had a personal relationship with J. H. Pl. Dep. 141-143; Lease Aff. ¶ 12. Plaintiff denied having any personal relationship with J. H. Pl. Dep. 142-146, Ex. 10; Lease Aff. ¶ 12. Mr. Lease reminded plaintiff that Dole policy prohibited supervisors from dating lower level employees in same department. Lease Aff. ¶ 12. Mr. Lease specifically told plaintiff that, if he was dating or was interested in dating J. H., then he should be honest and admit the relationship so that Dole would move one of the two to an open position in a different department. Id. Plaintiff again denied a relationship with J. H. Id.; Pl. Dep. 142-146. At that point, Mr. Lease advised plaintiff during this meeting to change his behavior with J. H. in order to end the perception among her co-workers that he was in a romantic relationship. Lease Aff. ¶ 12; Pl. Dep. Ex. 10. The record does not reveal that such discussion then lead to any adverse employment action.

### 5. December 2007: Pay Dispute

In December 2007, plaintiff approached Mr. Lease to discuss his pay and the pay of the other warehouse supervisors. Lease Aff. ¶ 13. Plaintiff told Mr. Lease that he had heard a rumor that two warehouse supervisors received a higher salary than he and the other

African-American supervisor.  Id.; Pl. Dep. 100.[4]  Mr. Lease explained to plaintiff that supervisor salaries were based on warehouse management experience of the individual and the individual's prior compensation in his previous position.  Lease Aff. ¶ 13. When plaintiff continued to pursue the specifics of the pay of other warehouse supervisors, Mr. Lease told plaintiff that supervisor salaries are treated as "confidential" within Dole and that he would not discuss other warehouse supervisors' salaries with plaintiff.  Id.

At the end of their meeting, plaintiff told Mr. Lease that he intended to file a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").  Id. Mr. Lease told plaintiff that filing an EEOC charge was perfectly within his rights.  Id.  Mr. Lease understood that both Dole policy and the law prohibited retaliation against plaintiff for voicing his pay concerns.  Id. ¶ 28; DeWitt Aff. ¶ 6.

### 6.    December 2007: Charge of Discrimination Made Against Plaintiff

In late December 2007, a maintenance department employee M. G. complained to her supervisor and HR manager Karol DeWitt that plaintiff had sexually harassed her for several months.  DeWitt Aff. ¶ 16.  M. G. began her Dole employment in November 2006 as a forklift operator in the shipping department.  M. G. Aff. ¶ 2.[5]  She was assigned to the team supervised by plaintiff.  Id.  M. G. voluntarily transferred from the shipping department to the maintenance department in November 2007 to avoid plaintiff's conduct toward her.  Id. ¶ 10.

As to the alleged harassing conduct, M. G. reported to Ms. DeWitt that, beginning

---

[4]    While plaintiff stated at the hearing that it was Mr. Roberts who gave hin this information, the only sworn evidence the court has been given is from Mr. Roberts, who testified that plaintiff broke into Mr. Lease's office and stole such information from Mr. Lease's desk. How such information was obtained is not relevant to the instant motion and has not factored into the court's consideration.

[5]    The affidavit is averred to by M. G. in her married name. M. C.

soon after she was hired, plaintiff began making unwelcome sexual comments about her body and that he found her attractive. M. G. Aff. ¶¶ 4-5. She alleged plaintiff's unwelcome comments became worse. Id. ¶ 6. Plaintiff began making daily comments of a sexual nature to her, about her appearance, her body, and his interest in her. Id. Eventually, plaintiff began to explicitly ask M. G. out for dates on an almost daily basis. Id. ¶ 7. She repeatedly reminded plaintiff that Dole policy clearly prohibited supervisors from dating employees in the same department. Id. ¶ 8. According to M. G., plaintiff would always respond to her that once he and M. G. clocked out of work, everything was "fair game," and that they could see each other after hours. Id.

She also claimed that when she repeatedly denied Plaintiff's requests for dates, he began to use his supervisory authority over her to punish her for turning him down. Id. ¶ 9. She reported that Plaintiff attempted to corner her alone after her shift ended after she turned down his advances. Id. This type of harassment continued during the remainder of her employment in the shipping department. Id. She did not report the harassment while working in the shipping department because she feared plaintiff would use his supervisory authority to fire her. Id. at ¶ 10. Instead, she sought and received a transfer to an open position in the maintenance department. Id.

Despite transferring to the maintenance department, M. G. reported that the sexual harassment continued. Id. at ¶ 11. She averred that plaintiff called her at work and then began visiting the parts room where she worked to talk to her. Id. On multiple occasions, plaintiff told her that the two could now date because she was no longer in the shipping department. Id. Plaintiff also began massaging her shoulders on multiple occasions without her consent. Id. During one of these visits in December 2007, she reported that plaintiff frightened her when he came up behind her and unexpectedly ran his hands through her hair.

Id. ¶ 12. She was frightened, backed up, and told plaintiff not to touch her. Id. Plaintiff then told her that she looked good, was sexy, and said "this is what you do to me" while he grabbed his crotch. Id.

M. G. then talked with her supervisor about plaintiff's sexual harassment, and reported the harassment to HR manager Karol DeWitt. Id. ¶¶ 13-14. In accordance with Dole's written Guidelines for Harassment, Ms. DeWitt immediately began a full investigation. DeWitt Aff. ¶ 19. As part of the investigation, Ms. DeWitt interviewed and obtained written statements from plaintiff, M. G., a coworker who had witnessed the alleged harassment in shipping, and a coworker who had witnesses the continued alleged harassment in maintenance. DeWitt Aff. ¶19, Ex. B.

While plaintiff has disputed the accuracy of M. G.'s affidavit, he has not filed any affidavits in rebuttal to M. G.'s affidavit or taken M. G.'s deposition.

### 7.    January 2008: Plaintiff is Confronted with Charges of Harassment

On January 4, 2008, Mr. Lease and Ms. DeWitt met with plaintiff to inform him about M. G.'s complaints and the investigation. Lease Aff.¶ 18; DeWitt Aff. ¶ 21; Pl. Dep. 200. Plaintiff admitted that Dole policy required that an investigation be conducted when sexual harassment complaints are made. Pl. Dep. 200-208.

During this meeting, Ms. DeWitt explained to plaintiff the specific allegations made by M. G., but plaintiff said nothing in response. Lease Aff. ¶ 18; DeWitt Aff. ¶ 21; Pl. Dep. 291-292. Ms. DeWitt requested that plaintiff provide her a copy of his telephone records in order to review some of M. G.'s claims. DeWitt Aff. ¶ 22. Plaintiff refused to provide a copy of his telephone records for Ms. DeWitt's investigation. Id.; Pl. Dep. 210-211, Ex. 18.

On January 7, 2008, plaintiff gave Ms. DeWitt a written document responding to M.G.'s allegations. Id. ¶ 23; Pl. Dep. Ex. 17. In his written response, plaintiff admitted

touching M. G.'s hair and being present when comments were made about her body and her "behind," but denied that such conduct was harassment. Pl. Dep. Ex. 17. At no time before, during, or after Ms. DeWitt's investigation was there any discussion or consideration about anyone's race or sex. DeWitt Aff. ¶ 24. Based on the investigation, including the document provided by plaintiff on January 7, 2008, Ms. DeWitt concluded plaintiff's conduct was inappropriate for a Dole supervisor. Id. ¶ 23.

On January 9, 2008, Mr. Lease and Ms. DeWitt met with plaintiff to give him a writing warning based on M. G.'s complaints. DeWitt Aff. ¶ 25, Ex. C; Lease Aff. ¶ 19, Ex. C; Pl. Dep. 218-219, Ex. 19. There was no change to Plaintiff's pay, job responsibilities, job assignment, etc., as a result of the written warning. DeWitt Aff. ¶ 25; Lease Aff. ¶ 19. In parts relevant to this action, particular, the warning advised plaintiff, as follows: to "understand that you cannot have any personal relationship with an employee you supervise or an employee in your department." DeWitt Aff. ¶ 25, Ex. C. He was also given the opportunity to disclose any relationship he may be engaged in with any other employee. Id. ¶ 25. Plaintiff was told that, if he was engaged in a relationship with a shipping department employee, then one of the two would be transferred to a different department. Id.

### 8. January 2008: Plaintiff's Performance Review

During the same month that plaintiff was confronted with allegations of sexual harassment, Mr. Lease also completed plaintiff's performance review for 2007. Lease Aff. ¶ 20, Ex. D. In this 2007 performance review, Mr. Lease rated plaintiff's performance as "fully meets requirements and expectations." Id. Because plaintiff's work as warehouse supervisor did not begin until September 2006, this 2007 performance review was the first written performance review of Plaintiff's performance by Mr. Lease. Id.; see also Pl. Dep. 121-130.

Plaintiff and Mr. Lease reviewed the 2007 performance review in a meeting with Mr. Lease on January 27, 2008. Pl. Dep. 121-130. Plaintiff was not completely satisfied with his 2007 performance review, though he admitted it contained several "good" ratings. Plaintiff admitted, however, that Mr. Lease had never evaluated him before. Pl. Dep. 126. Plaintiff's evaluation did not result in any pay loss, job or status change for him. Lease Aff. ¶ 21. During his deposition, plaintiff testified that he felt Mr. Lease had "marked down" his review because of M. G.'s complaints. Pl. Dep. 121-130. Plaintiff also complained about the inclusion of any consideration of the investigation in the 2007 evaluation period because the "investigation" had been conducted in 2008 (not 2007) and was therefore not completed during the 2007 calendar year. Pl. Dep. 130-133. Plaintiff admits that it would have been perfectly acceptable for Mr. Lease to have taken the complaints into consideration for the 2008 performance review. Id. Plaintiff admitted that during this annual review meeting, Mr. Lease never mentioned plaintiff's race. Pl. Dep. 133-139.

Based on Mr. Lease's good review of plaintiff's work performance, Mr. Lease recommended that plaintiff receive a discretionary merit increase of $450. Pl. Dep. 199.

### 9. January 2008: Plaintiff Files a Charge of Discrimination

On January 29, 2008 plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") in which he claimed race and sex discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964. Pl. Dep. 118-119, Ex. 10. In that charge, plaintiff outlined his August 2007 discussion with Mr. Lease concerning changing his behavior towards J. H. in order to stop rumors about a romantic relationship. Id. He also alleged that he was being paid less than the Caucasian and Hispanic supervisors and that such discrepancy was due to his race and that his 2007 performance review was "written down" after he received the January 9, 2008 written

warning.  Id.

### 10.  June 2008: Plaintiff Receives a Merit Increase and Positive Mid-Year Review

In June 2008, Mr. Lease decided to award plaintiff a discretionary merit increase of $909.00.  Lease Aff. ¶ 21, Ex. E; Pl. Dep. 198. Despite Mr. Lease's recommendation, plaintiff testified that he was not satisfied with such increase, Pl. Dep. 198, even though such increase was more than twice as much as plaintiff's 2007 merit increase.  Pl. Dep. 199, Ex. 15. In mid-July 2008, Mr. Lease prepared plaintiff's 2008 Mid Year Review. Lease Aff. ¶ 25, Ex. F.  Plaintiff admitted that his 2008 Mid-Year Review was good, and plaintiff agreed with the review.  Pl. Dep. 145-147.

### 11.  Early September 2008: Plaintiff's Romantic Email to J. H. is Discovered

In September 2008, Mr. Lease was given a copy of an email from plaintiff to J.  H.[6] The June 12, 2008, email confirmed that plaintiff and J. H. had been engaged in a serious romantic relationship for a long period of time, and that J. H. had recently ended the relationship.  Roberts Aff. ¶11, Ex. A; Hartness Aff. ¶ 9, Ex. A; Lease Aff. ¶ 23, Ex. G.[7]

Based on such email, Mr. Lease averred that he realized that plaintiff had not only been violating Dole's anti-fraternization policy, but that plaintiff had lied to him repeatedly about the prohibited relationship. Lease Aff. ¶ 26. Mr. Lease shared the email with Ms. DeWitt, who conducted an investigation into the email, including meeting with the

---

[6]     While plaintiff takes issue with who found such email and when it was found, the only evidence the court has is that Mr. Roberts found the email on a company printer and turned it over to Mr. Lease in September 2008.

[7]     Plaintiff takes issue with the discovery of such email in September 2008, contending that it was discovered earlier in the summer based on a print date appearing on the email.  The only competent evidence as to when Mr. Lease discovered the email comes, however, from Mr. Lease. Plaintiff's speculation is neither probative nor admissible.

subordinate employee, J. H., Mr. Roberts (the other African-American supervisor), plaintiff, and Mr. Lease. Id. at ¶ 24; DeWitt Aff. ¶ 26.

### 12.    September 19, 2008: Plaintiff is Suspended

On September 19, 2008, Ms. DeWitt and Mr. Lease met with plaintiff, showed him the email, and informed him he was being suspended while Ms. DeWitt investigated plaintiff's personal relationship with J. H. Pl. Dep. 53, Ex. 6. Plaintiff testified that he could not recall what was said in the September 19, 2008, meeting except that he was asked if he wrote the email. Id. at 47. Plaintiff responded that he "couldn't confirm or deny the fact that [he] had written it." Id. at 48. At the meeting, plaintiff did not deny having a personal relationship with J. H. Lease Aff. ¶ 24. At his deposition, plaintiff testified that during the September 19, 2008, meeting, neither Mr. Lease nor Ms. DeWitt said anything about race, sex, or plaintiff's earlier EEOC charge. Pl. Dep. 46-50. Plaintiff further admitted that at no time during his employment did anyone comment to him about his dating white females. Pl. Dep. 239-251. When asked what evidence he had to support his theory that Dole discriminated against him for dating white females, plaintiff testified that it was his own perception. Id.

### 13.    September 24, 2008: Plaintiff's Employment with Dole is Terminated

Mr. Lease decided to terminate plaintiff's employment for "conduct unbecoming a Dole manager." Lease Aff. ¶ 25, Ex. H. Mr. Lease averred that the decision to terminate plaintiff was based on two reasons:

(1)    plaintiff repeatedly lied about his having a romantic relationship with  J. H.; and

(2)    his lack of judgment in knowingly violating Dole policy by engaging in a personal relationship with J. H. and his lying about it.

Id. ¶ 26. Mr. Lease averred that at no point was J. H.'s race or plaintiff's January 2008 EEOC Charge considered in his decision to terminate plaintiff's employment. Id. ¶¶ 25-26; DeWitt Aff. ¶ 30. On September 24, 2008, plaintiff's employment was terminated during a meeting with Ms. Dewitt and Mr. Lease. Lease Aff. ¶ 25. Plaintiff was given a copy of his Notice of Termination. Id. At no point during this meeting did anyone mention race, sex, or his January 2008 EEOC charge. Pl. Dep. 15-21; DeWitt Aff. ¶ 30; Lease Aff. ¶ 25. Plaintiff testified that he understood his termination was due to his "personal relationship with another Dole employee. . . [J. H.]." Pl. Dep. 20-24.

In his deposition, plaintiff admitted to having a serious, long-standing, personal relationship with J. H. Id. at 20-42. This relationship was romantic, sexual, and financial. Id. Plaintiff testified that his personal relationship with her began in March or April of 2007, and continued until J. H. ended the relationship in spring of 2008. Id. at 33-38.

### 14. October 22, 2008: Plaintiff Files a Second Charge of Discrimination

On October 22, 2008, plaintiff filed his second EEOC charge. Pl. Dep. 234-235, Ex. 27. In it, he alleged that his discharge was based on racial discrimination and retaliation in violation of Title VII. Id. Specifically, plaintiff alleged that he was treated differently than non-African-American supervisors who were not terminated for allegedly similar conduct. Plaintiff did not allege discrimination based on his gender.

### C. Dole's Anti-Discrimination Polices

It is undisputed that Dole has issued "Human Resources Guidelines for Employees" (hereinafter "HR Guidelines"), which govern employment with Dole. DeWitt Aff. ¶¶ 2-7, Ex. A. Dole's HR Guidelines contain an Equal Employment Opportunity ("EEO") statement, stating that Dole

> is an equal opportunity employer and makes employment decisions on the basis of merit so that the most qualified person is in every job. Company

> policy prohibits unlawful discrimination or harassment based on race, color….sex, [and] gender

among a number of other protected classes.  Id. ¶ 3, Ex. A.  Dole's HR Guidelines define unlawful harassment as

> unwelcome conduct which has the purpose or effect of unreasonably interfering with an employee's work performance or which creates an intimidating, hostile or offensive work environment.

Id.  Dole's HR Guidelines further state that "[s]hould any employee . . . engage in inappropriate discriminatory or harassing behavior, immediately contact human resources."

Id.  Dole's HR Guidelines further contain a harassment-free workplace policy. This policy states, in pertinent part, that

> Dole is committed to providing a work environment that is free of sexual harassment as well as other unlawful harassment based on such factors as race, color, sex, gender….

Id. ¶ 4, Ex. A. Dole's HR Guidelines also state that "[a]ny incident of unlawful harassment, by any Company employee or any other person, should be reported promptly to the employee's supervisor and/or to an HR Manager." Id. ¶ 5, Ex. A. Dole's HR Guidelines also prohibit retaliation. Specifically, the HR Guidelines state: "Retaliation by a Company employee against any individual who makes a complaint of unlawful harassment or otherwise invokes this policy is strictly prohibited." Id. ¶ 6, Ex. A.  Complaints about retaliation "should be immediately brought to the attention of the Human Resources department." Id.

The HR Guidelines also contain Standards of Conduct.  Id. ¶ 7, Ex. A.  Among these Standards of Conduct, the HR Guidelines prohibit "misrepresentation (including by omission) . . . [of] employment information." Id.

Plaintiff testified that he received a copy of Dole's HR Guidelines. Pl. Dep. 228-229, Ex. 24.

## III.  Summary Judgment Standard

Defendants have moved for summary judgment and plaintiff has filed his response.

Rule 56(a), Federal Rules of Civil Procedure, provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed.R.Civ.P. 56(a).  The rule goes on to provide procedures for plaintiff to use in responding

to a Motion for Summary Judgment:

> **(c) Procedures.**
> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> **(2) Objection That a Fact Is Not Supported by Admissible Evidence.**  A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> **(3) Materials Not Cited.**  The court need consider only the cited materials, but it may consider other materials in the record.
>
> **(4) Affidavits or Declarations.**  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed.R.Civ.P. 56(c).

On a motion for summary judgment, the moving party has the burden of production

to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the *admissible evidence* of the non-moving party must be believed and all justifiable inferences must be drawn in his

or her favor. <u>Anderson</u>, <u>supra</u>, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Id.</u>, at 252. While a plaintiff may present circumstantial evidence to support his claim of discrimination, unsupported speculation is insufficient to defeat a motion for summary judgment. <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 960 (4th Cir. 1996); <u>Felty v. Graves- Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987).

## IV. Discussion

### A. Plaintiff's Title VII and Section 1981 Claims of Racial Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). To establish a *prima facie* case of discriminatory discharge, plaintiff must show: (1) he is a member of a protected class; (2) he was discharged; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).[8]

### 1. Third Element: Reasonable Expectations

The pivotal inquiry here is whether at the time of his discharge plaintiff was meeting his employer's legitimate expectations. Such element requires the court to focus on the employer's perceptions, not the perceptions of the employee. <u>Farasat v. Paulikas</u>, 32 F. Supp. 2d 249, 255 (D.Md. 1998), *aff'd* 166 F.3d 1208 (4th Cir.1998). Plaintiff argues only that the third element is satisfied because defendants "admit that Plaintiff received a merit

---

[8]     Similar standards are applicable to plaintiff's parallel claim under 42, United States Code, Section 1981.

increase and a performance evaluation indicating that Plaintiff 'Fully meets requirements and expectations.'" Pl. Resp. Mem. at 36. Even if such argument had been presented in admissible form, such would miss the mark as plaintiff's job performance prior to the adverse employment action is irrelevant. Instead, McDonnell Douglas Corp., supra, requires the court to consider whether plaintiff has presented evidence upon which a reasonable fact finder could determine that he was meeting his employer's legitimate expectations "at the time of the adverse employment action." Id.

As discussed at length above, plaintiff was not meeting the legitimate expectations of his employer at the time he was discharged. It is undisputed that at the time of discharge, Dole discovered evidence that lead it to believe that not only was plaintiff violating Dole's anti-fraternization policy for supervisors, but that he had repeatedly lied about such conduct to his supervisors. While plaintiff has argued that he neither violated the policy nor lied to his employer, plaintiff has presented no evidence to refute that Dole and Dole's decisionmakers, Mr. Lease and, perhaps, Ms. DeWitt, reasonably perceived that he had violated the policy and lied. When an employee is aware of an employer's policy and violates it, he has not met the employer's legitimate expectations. Washington v. Safer Foundation, 274 F. App'x 484, 485 (7th Cir. 2008) ("[Plaintiff] does not dispute that he was aware of Safer's absence policy and violated it. That is enough to doom his *prima facie* case.") Closer to home, trial courts within the Fourth Circuit have consistently held that

> an employee who intentionally gives misleading information to his employer has not met his employer's expectations and has given the employer a legitimate, non-discriminatory reason to terminate the employee.

McLean v. Broadfoot, 2011 WL 1833302, at *12 (W.D.Va. May 13, 2011) (citation omitted); see also Garrett v. Langley Federal Credit Union, 121 F. Supp. 2d 887, 901 (E.D.Va. 2000) (lying to one's employer is a legitimate, non-discriminatory rationale for terminating

employment). Inasmuch as defendants' evidence that plaintiff both violated the HR

Guidelines and lied to his immediate supervisor has not been countered by plaintiff, plaintiff

cannot establish a *prima facie* case of race discrimination.


### 4.    Fourth Element: Disparate Treatment

Even if plaintiff has presented admissible evidence on the third element, plaintiff has

not presented any evidence as to the fourth element, which requires that he demonstrate that

the discharge occurred under circumstances that raise a reasonable inference of unlawful

discrimination.

> A plaintiff is entitled to a trial on the merits of a Title VII claim if he or she
> establishes a factual record permitting a reasonable finder of fact to conclude
> that it is more likely than not that the adverse employment action was the
> product of discrimination or retaliation.

Darvishian v. Geren, 404 Fed.Appx. 822, 828 (4th Cir. 2010) (citation omitted). In this case,

plaintiff has *alleged* but offered no proof that Caucasian employees were treated differently

than he was treated inasmuch as they were not terminated for misconduct. Even if plaintiff's

allegations concerning other relationships in the workplace had been submitted in a verified

form, plaintiff has failed to show that defendant treated any similarly situated Caucasian

manager differently.[9] Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133-34 (4th Cir. 2002) (no

*prima facie* discharge case because plaintiff was "unable to advance proof that other

employees who are not members of the protected class were treated differently than

[plaintiff] under similar circumstances.")  Indeed, plaintiff has come forward with absolutely

no evidence that any member of management, who was perceived by Dole to have lied to

their supervisor, was treated differently.  Dole has come forward as to each allegation of

---

[9]    The court will discuss allegations of disparate treatment in discipline short of
termination below.

disparate treatment and shown either how such conduct is dissimilar to plaintiff's conduct or how Dole treated such conduct in a consistent manner. For example, as the Caucasian supervisor who plaintiff contends was treated differently after it was discovered that he was paying a subordinate employee to clean his house, defendants have shown that both the supervisor and the employee <u>admitted</u> to the conduct when questions by Mr. Lease, and Mr. Lease instructed him to not have any Dole employees work for him after hours. Second Lease Aff. ¶ 7. Plaintiff, therefore, has not satisfied the fourth element of a *prima facie* case under <u>McDonnell Douglas Corp.</u>

### 3. Pretext

The court has considered whether plaintiff, even though he has not established *a prima facie* case, has presented any evidence that the legitimate reason given by his employer was mere pretext for racial discrimination. Where a plaintiff establishes a *prima facie* case, the burden would then shift to the employer to show some legitimate, nondiscriminatory reason for the employment action. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981). In this case, defendants have clearly shown that plaintiff was fired because they perceived that he not only violated policy, but that he lied about it to his supervisor. Plaintiff, without support, argues in his responsive argument that such reason was pretext as defendants' true desire was to terminate plaintiff because he dated a white female, J. H. Plaintiff has not produced any evidence to support this theory beyond his own speculation.

In addition to plaintiff's pretext argument being unsupported by any evidence, a presumption arises in favor of defendants under <u>Proud v. Stone</u>, 945 F.2d 796 (4th Cir. 1981), that the adverse employment action is presumed not to be pretextual where the act is done by the same person who recently hired the plaintiff. That presumption appears

applicable here inasmuch as it was Mr. Lease who both hired plaintiff in 2006 and fired him in 2008, which the court considers to be close temporal proximity. Indeed, such presumption finds even more support where, as here, Mr. Lease gave plaintiff a positive mid-year review and merit increase just months before he terminated plaintiff. This presumption arises because it would defy logic for a person who is supposedly motivated by racial bias or prejudice to both hire a person in a protected class and then turn around and fire that same person. In this case, that presumption is even stringer inasmuch as Mr. Lease conduct toward plaintiff was consistently favorable thorough out plaintiff's employment. Indeed, Mr. Lease gave plaintiff a positive mid-year performance review and a merit raise only months before he terminated plaintiff's employment. Plaintiff's speculation and conjecture raises only a mere possibility of discrimination rather than the reasonable probability which is necessary to support an inference of discrimination. Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241-42 (4th Cir. 1982). Speculative assertions that a defendant's real motivation was racially based is not enough to withstand summary judgment, Goldberg v. B. Green and Co., 836 F.2d 845, 848 (4th Cir. 1988), and conclusory statements will not satisfy plaintiff's burden in responding to the motion for summary judgment. Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211 (4th Cir. 1987). Unsupported allegations "do not confer talismanic immunity from Rule 56." Ross v. Communications Satellite Corp., 759 F.2d 355, at 365 (4th Cir. 1985), *overruled on other grounds*, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

Finding that no genuine issue of material fact remains for trial as to these claims, the court will dismiss plaintiff's Title VII and Section 1981 claims of racial discrimination for the reasons discussed above.

**B.     Plaintiff's Claims of Racial Motivation in Dole's Work-Place Discipline**

To establish a *prima facie* case of discrimination in the enforcement of employee disciplinary measures, the plaintiff must show: (1) that he is a member of a class protected by Title VII; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993); Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985).

In reviewing the discipline (as opposed to the termination asserted in the earlier claims), plaintiff has not established that any discipline Dole subjected him to amounted to an "adverse employment action." While plaintiff argued at the hearing that he considered the challenged written warning as adverse, the law is very specific as to what this court can consider as an adverse employment action. In evaluating the disciplinary measures, "employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred." Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985). "Adverse employment action includes any . . . act . . . if, but only if, that act . . . results in an adverse affect on the terms, conditions, or benefits of employment." Von Gunten v. Maryland, 243 F.3d, 858, 866 (4th Cir. 2001) (quotation omitted). A written warning, without more, does not constitute an adverse employment action. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 651-52 (4th Cir. 2002). While plaintiff states that he *believed* the written warning was adverse because it could have impacted later job performance evaluations, that fear never panned out as plaintiff received, within months, a very positive evaluation and a merit increase. Thus, such written warning did not have any adverse impact "on the terms, conditions, or benefits of employment." Von Gunten, supra.

Even if plaintiff could have shown that the written warning he received was an

"adverse employment action," he has not shown that any similarly situated employees were treated less harshly. To be similarly situated, another employee must have been disciplined by the same supervisor. Radue v. Kimberly-Clark Corp., 219 F 3d 612, 618 (7th Cir. 2000). Plaintiff has not presented any evidence that Mr. Lease disciplined any other similarly situated employee less harshly. While plaintiff points to a number of other shipping department employees who plaintiff alleges were engaged in personal relationships in violation of Dole's policy, Pl. Resp. Mem. at 42-43, plaintiff's argument fails to acknowledge that the January 2008 warning complained of was not issued for his having an inappropriate personal relationship with another employee, rather, it was discipline for misconduct toward M. G., which defendants determined was unbecoming a supervisor and issued him a written warning. DeWitt Aff. ¶ 24. Thus, plaintiff cannot establish a prima facie case of discrimination in issuing discipline. The court will also note that plaintiff has not established that the legitimate reason given for his discipline was pretext for the same reasons set forth above for plaintiff's failure to establish pretext for his termination claim.

Finding that plaintiff has not satisfied his burden on his claims of discrimination in the enforcement of employee disciplinary measures and that no genuine issues of material fact remain for trial, summary judgment will be granted as to those claims.

C. **Plaintiff's Claims of a Racially Hostile Work Environment/Disparaging Comments**

In his Amended Complaint, plaintiff also alleges that he was subjected to a hostile work environment. To establish a claim of hostile work environment based upon race, plaintiff's burden is to produce evidence that: (1) the conduct to which he was subjected was unwelcome; (2) the harassment was based upon his race; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) there is some basis for imposing liability on the employer. Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th

Cir 2001); Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 772 (4th Cir. 1997). A claim of a race-based hostile work environment requires proof that the workplace is

> permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations omitted).  See also Faragher v. Boca Raton, 524 U.S. 775, 788 (1998) (non-severe, isolated incidents consisting of teasing and insults do not violate federal law). Whether conduct is "'hostile' or 'abusive' can be determined only by looking at all the circumstances, [such as] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. at 23.

### 1. Plaintiff has Presumably Satisfied the First Two Elements

For the limited purpose of this motion, the court will presume without deciding that plaintiff has satisfied the first two elements as to his hostile work environment claim.

### 2. Plaintiff has not Satisfied the Third Element

To satisfy the third element of a hostile work environment claim, plaintiff must come forward with evidence tending to show that he was subjected to harassment that was sufficiently severe or pervasive so as to create a hostile work environment.  In his Amended Complaint, plaintiff asserts the following allegations in support of his hostile work environment claim:

a.  Mr. Lease and Ms. DeWitt failed to stop "rumors" about his sexual relationship with shipping department employees and "utilized" those rumors against plaintiff. (Am. Compl. ¶¶ F(1-2).)

b.  They "utilized white female employees to make complaints against black male employees. . ." (Am. Compl. ¶ F(4).)

c.  Plaintiff's disagreement with his 2007 performance review. (Am. Compl. F(5).)

d.  An "offensive, aggressive and antagonistic conversation with Ms. DeWitt, which Plaintiff admits did not involve race. (Am. Comp. ¶ F(6).)

e.  An unidentified employee's statement to Plaintiff to "watch his back..." (Am. Compl. ¶ F(7).)

None of these allegations, standing alone or in combination, are sufficient to satisfy plaintiff's burden of coming forward with evidence that the harassment was sufficiently severe or pervasive to create an abusive working environment. Plaintiff has presently absolutely no evidence that the "rumors" concerning a personal relationship with a subordinate employee involved race. Instead, the only evidence of record is that there were "rumors" that plaintiff was having an inappropriate relationship with a subordinate employee in his department, which were later proved to be true. Lease Aff.¶ 11; Roberts Aff. ¶ 6. Indeed, the evidence of record in the form of plaintiff's own charge of discrimination indicates that when plaintiff was confronted by his supervisor with these "rumors" and denied their validity, Mr. Lease advised plaintiff to change his behavior towards J. H. in order to stop rumors about a romantic relationship. Pl. Dep. 118-119, Ex. 10.

Plaintiff's unfounded allegation that Mr. Lease and Ms. DeWitt "utilized" Caucasian females to make complaints against black males has been completely unsupported by the production of any evidence. While there is evidence that M. G. And J. H. are Caucasian and made complaints or voiced concerns to management about plaintiff, there is no evidence that such women were in any manner recruited by Mr. Lease or Ms. DeWitt.

As to his allegations concerning his performance reviews, as discussed above, plaintiff admitted that neither Mr. Lease nor Ms. DeWitt ever made any reference to his race or color.

As to plaintiff's claim that an unidentified person told him to "watch his back," plaintiff presents no evidence that connects up this alleged statement to race or gender. Plaintiff has come forward with no evidence supporting such allegation.

Finally, plaintiff alleged that Ms. DeWitt made a disparaging comment to him during a company picnic in August 2008. Plaintiff has alleged that Ms. DeWitt used the term "boy," not in reference to a young child, but in a racially derogative context. Ms. DeWitt testified that she did not recall using such term, and if she did use the word "boy"

> it was only used as a reference to male employees versus female employees ('boys' and 'girls'). It had never crossed my mind that the word 'boy' had any meaning related to anyone's race or color.

DeWitt Aff. ¶ 33. If in fact such term was used in a racially derogatory context, rather than in reference to a young person in general, this court believes that jurors would equate the use of the term "boy" in such context as the use of a racial pejorative, which are never acceptable and which any reasonable, civil person would find objectionable and offensive. As the Court of Appeals for the Fourth Circuit has found:

> Far more than a "mere offensive utterance," the word '[racial pejorative]' is pure anathema to African-Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as '[racial pejorative]' by a supervisor in the presence of his subordinates.

Spriggs v. Diamond Auto Glass, 242 F.3d at 185 (citations and corresponding quotation marks omitted). Plaintiff has not come forward with any admissible evidence that such remark was actually uttered.

If the court were to assume that plaintiff would testify under oath that he heard Ms. DeWitt use such racial pejorative at the company picnic, that statement, standing alone,

would be insufficient as a matter of law to satisfy plaintiff's burden. Unlike the plaintiff in Spriggs, plaintiff here has neither alleged nor proved that he was exposed to racist comments on a "'continuous daily' basis," id., at 184, or that based on all the circumstances, such exposure was sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment. Harris v. Forklift Sys., Inc., 510 U.S. at 23

If such term was used, there would be no doubt but that the comment would be utterly offensive to any civilized person regardless of their race, but especially African-Americans; however, even an utterly offensive comment, made in isolation, is not so "severe" that it could be reasonably viewed as changing the terms and conditions of plaintiff's employment. In Hartsell, supra, the Court of Appeals for the Fourth Circuit held that Title VII "prohibits only harassing behavior that is so severe and pervasive as to render the workplace objectively hostile." Id., at 773. In Harris, supra, the Supreme Court held that isolated comments are simply not enough to give rise to a Title VII claim of unlawful harassment. Severe conduct is conduct that would be extreme, amounting to a change in the terms and conditions of employment. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998). In determining whether there was a hostile or abusive work environment, the court looks to the totality of the circumstances. Faragher v. City of Boca Raton, 524 U.S. at 787-88. In making such a determination, the Supreme Court requires courts to consider

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Harris, supra, at 23. Plaintiff points to no racially motivated manifestations by any fellow worker or supervisor, and to no incidents of subsequent conduct indicating any change in how plaintiff was treated. Even after plaintiff filed a charge of discrimination with the

EEOC in January 2008, his employer gave him a positive mid-year evaluation as well as a merit pay increase that was more than double the increase he had received the previous year. The totality of the circumstances point not to an employer who was trying to make work so inhospitable as to cause plaintiff to quit; rather, the circumstances show that plaintiff's employer at every turn attempted to keep plaintiff happy in his work, even going so far to remind him that if he was having a relationship with an subordinate employee, accommodations could be made to move one of the employees to another department without consequence. In considering all the circumstances, the court has also considered defendants' undisputed evidence that Dole had a written policy prohibiting unlawful harassment and discrimination, DeWitt Aff. ¶ 3, and that plaintiff knew of the policy. Pl. Dep. 203-204. Plaintiff never utilized such policy to register a complaint about such alleged comment. Lease Aff. ¶ 30; Pl. Dep. 276. While plaintiff says he wrote a letter on September 10, 2008, to Ms. DeWitt to complain about her comment, Ms. DeWitt has averred that she never received such a letter. Second DeWitt Aff. ¶ 9. Further undermining the probability that such letter was ever sent or received by Ms. DeWitt is the undisputed fact that plaintiff never produced such letter in response to defendants' demand for production; rather, it was only produced after plaintiff's deposition was compelled by this court and has never been authenticated by plaintiff, making it inadmissible.

Ultimately, plaintiff's claim fails because plaintiff has not shown that this single incident, even taken as true, was severe or pervasive. Plaintiff testified that at no other time, either in Ohio or North Carolina, had any supervisor or manager used any racially derogative term. Pl. Dep. 277-78. Considering all the evidence of record, plaintiff has come forward with no probative evidence upon which a reasonable person could conclude that he was being harassed or subjected to a hostile work environment, or that such was so severe or pervasive

as to render the workplace objectively hostile.

### 3.    The Faragher/Ellerth Affirmative Defense

Pursuant to Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher, 524 U.S. at 775, where an alleged harasser creates a hostile work environment by engaging in severe or pervasive conduct based on a plaintiff's race, the employer may be held liable unless it can satisfy both prongs of an affirmative defense. Faragher, 524 U.S. at 807. First, the employer must demonstrate that it exercised reasonable care to avoid the harassment and eliminate it when it might occur. Id. Second, the employer must show that the employee failed to take advantage of the employer's safeguards and to otherwise prevent harm that could have been avoided. Id. While this court has considered such failure in a totality of the circumstances analysis under the third element of a hostile work environment claim, the court will now consider such in context of defendants' assertion of the affirmative defense.

First, Dole has a published policy prohibiting unlawful harassment and discrimination. DeWitt Aff. ¶ 3. This is undisputed as plaintiff admitted having received a copy of the policy. An employer's institution and enforcement of an anti-harassment policy is proof that it exercised reasonable care to prevent unlawful harassment. Brown v. Perry, 184 F.3d 388, 395 (4th Cir. 1999).

Second, defendants have presented undisputed evidence that plaintiff, a salaried member of management, also knew how to make a complaint if he felt he was being harassed as made evident by his December 2007 report to Mr. Lease about his disparate pay concerns. Pl. Dep. 97-100; Lease Aff. ¶ 13. Despite the existence of the policy and plaintiff's demonstrated knowledge in how to seek redress under the policy, plaintiff failed to report to Mr. Lease or the HR department the alleged August 2008 picnic encounter with Ms. DeWitt. Lease Aff. ¶ 30; Pl. Dep. 276. Thus, plaintiff failed to avail himself of the in-house

procedures for bringing such alleged misconduct to the company's attention, id., as it is plaintiff's obligation to take some action to put the company on notice that he has been subjected to unlawful, prohibited conduct. Reese v. Meritor Auto, Inc., 113 F.Supp. 2d 822, 828-29 (W.D.N.C. 2000).

Finally, plaintiff's conclusory allegation in his Response that Mr. Lease received insufficient training provides no basis for denying Dole summary judgment on its Faragher/Ellerth affirmative defense. Having established both prongs of the Faragher/Ellerth affirmative defense, defendants are also entitled to summary judgment on this claim.

**D.**    **Plaintiff's Retaliatory Discharge Claim**

Plaintiff has also alleged that he was discharged not because he engaged in prohibited conduct and lied to his employer; rather, he contends that he was discharged in retaliation for engaging in the protected conduct of filing the January 2008 charge of discrimination with the EEOC. To establish a prima facie case of unlawful retaliation, plaintiff must prove three elements: (1) that he engaged in a protected activity; (2) that an adverse employment action was taken against him; and (3) that there was a causal link between the protected activity and the adverse employment action. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005), cert. denied, 547 U.S. 1041 (2006).

**1.**    *Prima Facie* **Case**

Plaintiff cannot satisfy his burden of showing  a *prima facie* case because he cannot show a "causal relationship" or nexus between his discharge and any protected activity. Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006); Navy Fed. Credit Union, 424 F.3d at 405-06.  In this case, nine months separate plaintiff's charge of discrimination and his termination.  Further, even while the charge was being investigated, Mr. Lease gave plaintiff a positive evaluation as well as a merit pay increase, which are events antithetical

to a claim of retaliation and which tend to break the causal chain.  Even without such positive events, complaints of retaliation are considered stale after only a few months.  <u>Book v. Maryland</u>, 337 F. App'x 301, 310 (4th Cir. 2009) (Plaintiff could not "prove that there is a causal connection between the engaged protected activity . . . and the adverse employment action" when plaintiff's "demotion occurred approximately nine months after" the protected activity); <u>Dowe v. Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 657 (4th Cir. 1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action ... negates any inference that a causal connection exists between the two.").

In his Response, plaintiff cites a "recorded statement by Defendant Lease on July 18, 2008," which Plaintiff alleges is "Exhibit H" to his Response. Pl. Resp. Mem. at 49.  The court has reviewed this "Exhibit H," which appears to be an unauthenticated "index" of what plaintiff believes is contained in a taped conversation with Mr. Lease. (#72-10).  Such index of what plaintiff believes to be on a tape is not admissible;[10] further, plaintiff never provided this document to defendants during discovery.  Rule 26 would instruct the exclusion of such exhibit.  Furthermore, plaintiff has not tendered to the court a copy of any alleged tape of such alleged conversation.  According to defendants' Reply, the copy they received is almost unintelligible and plaintiff has not had the tape transcribed by a stenographer.  Thus, even if the court were to ignore the procedural missteps of plaintiff, the tape would be

---

[10]    The seven requirements for admission of a taped conversation are that: (1) the recording device was capable of taking the conversation now offered in evidence; (2) the operator of the device was competent to operate the device; (3) the recording is authentic and correct;(4) changes, additions or deletions have not been made in the recording;(5)the recording has been preserved in a manner that is shown to the court; (6) the speakers are identified; and (7)the conversation elicited was made voluntarily and in good faith, without any kind of inducement. United States v. McMillan, 508 F.2d 101, 104 (8th Cir.1974). <u>United States v. Bagguley</u>,1987 WL 35045, *6 (4th Cir. 1987)(citing <u>United States v. McMillan</u>, 508 F.2d 101, 104 (8th Cir.1974).

inadmissible as the lack of either a clear tape, a vetted transcript, or authentication of the tape's contents would require the finder of fact to speculate as to the tape's contents.

Plaintiff has also submitted an undated memorandum from Mr. Lease to Ms. DeWitt summarizing Mr. Lease's July 18, 2008, conversation with plaintiff. (#72-12), Exhibit J. In it, Mr. Lease initially recommended that plaintiff be terminated. Id. Plaintiff concludes that this recommendation for termination was based on what plaintiff describes as Mr. Lease's "'feelings' about Plaintiff opposing discriminatory acts." Pl. Resp. Mem. at 49. This argument is mere speculation as neither the memorandum nor any other evidence of record supports such theory.

In Reply, Mr. Lease admits to being frustrated with plaintiff following this July 18, 2008, conversation, not because plaintiff discussed what he termed "inequities" based on race in the shipping department, but because plaintiff yet again wanted to debate about his January 2008 written warning. Second Lease Aff. ¶ 17. During the July 2008 meeting, Mr. Lease repeatedly encouraged plaintiff to put aside the issues surrounding the written warning and concentrate on the future, and he assured plaintiff that he had already done so and that he hoped the two could start over on a clean slate. Id. It is equally undisputed that after sending his July 18, 2008, memorandum to Ms. DeWitt, however, Mr. Lease changed his mind about his recommendation for termination based on his frustration with plaintiff's failure to accept responsibility for his actions, abide by Dole's policies, and move on. His frustration aside, Mr. Lease realized termination was not then warranted. Id. ¶ 18. Thus, there is no evidence that any adverse action was taken as a result of plaintiff's July 18, 2008, conversation with Mr. Lease. Id. Without an adverse action resulting from their meeting, plaintiff cannot establish an essential element of his retaliatory discharge claim.

Plaintiff also argues that two written statements he submitted to the EEOC between

the time he filed the charge and his discharge support his discharge retaliation claim. Specifically, plaintiff argues that defendants retaliated against him after he submitted responses to the EEOC's request for additional information in June 2008, and after he submitted an August 12, 2008, statement to the EEOC. Pl. Resp. Mem. at 51. The problem with this argument is that plaintiff assumes that these responses were shared with Dole. Id. Plaintiff has produced no evidence that defendants were even aware at the time of discharge of either plaintiff's June 2008 response to the request for additional information or his August 2008 statement to the EEOC. Further undermining this theory is plaintiff's failure to include these two statements in his post-termination charge of retaliation filed with the EEOC. Such letters cannot, therefore, form the basis of his retaliatory discharge claim in this court.

Plaintiff next argues that the email investigation that ultimately concluded with his termination in September 2008 was retaliation for plaintiff's "opposition" to "inequities" discussed with Mr. Lease on July 18, 2008. Pl. Resp. Mem. at 52. While plaintiff states as fact that Mr. Roberts found the email on "June 13, 2008" – the apparent print date of such document – such unsupported contention is contrary to the sworn statements of Messrs. Roberts and Lease, and Ms. DeWitt. Mr. Roberts avers in his deposition that it was he who discovered the email in September 2008, Roberts Aff. ¶ 11, and that he shared the email with Mr. Lease that month, Id. ¶ 12, who in turn shared it with Ms. DeWitt. Lease Aff. ¶ 24. Ms. DeWitt avers that her investigation into the email began immediately after it was shared with her. DeWitt Aff. ¶ 26. Plaintiff's contrary speculation, therefore, fails to create a genuine issue of material fact for the jury.

Plaintiff has failed to satisfy his burden of submitting evidence that would support a *prima facie* case of retaliation.

### 2. Pretext

Even if plaintiff had established a *prima facie* case of retaliation, he has again failed to show that Dole's legitimate, non-discriminatory explanation for the termination is mere pretext for retaliation. In support of his argument for pretext, plaintiff's response relies solely on the memo Mr. Lease sent to Ms. DeWitt following the July 18, 2008, meeting. Pl. Resp. Mem. at 55. Plaintiff argues that Mr. Lease "admits and states his reasons for recommending Plaintiff's termination, Plaintiff's reporting of 'inequities' in his department." Id. As discussed above, this is plaintiff's own speculation as to the decisionmaker's motivation, which finds no support anywhere in the admissible record. Plaintiff has not shown pretext.

\* \* \*

For the reasons discussed above, the court will grant defendants motion for summary judgment on plaintiff's retaliatory discharge claim.

### E.     Plaintiff's Discipline Retaliation Claims

Plaintiff also contends that he was disciplined in retaliation for engaging in protected activity, to wit, the filing of the January 29, 2008, charge of discrimination with the EEOC. However, the only disciplinary action (as opposed to termination) taken by defendants was the January 9, 2008, disciplinary action that *preceded* the January 29, 2008, charge of discrimination. Thus, plaintiff has not even plausibly alleged an actionable disciplinary action. All that remains between January 2008 and his September 2008 termination is his positive mid-year evaluation and raise. Even *negative* performance evaluations do not qualify where the evaluation does not result in a loss of pay, demotion, or other adverse employment consequences. Morrison v. Carpenter Tech. Corp., 193 F. App'x 148 (3d Cir. 2006). Thus, plaintiff's claim fails from inception and summary judgment will be granted as to that claim.

### F.     Plaintiff's Title VII Disparate Pay/Work Claim Fails

Plaintiff also alleged in his Amended Complaint that, based on his race, he was not paid as much as either the Caucasian warehouse supervisor or the Hispanic warehouse supervisor, all in violation of Title VII.[11]  Am. Compl. at 5-7.  As discussed above, the only evidence concerning how Dole determined supervisory pay shows that it based starting pay on relevant supervisory experience and salary history where such person was being recruited away from another company.  Plaintiff has offered no admissible evidence, other than his own speculation that Dole's motivation was race, to demonstrate that Dole's proffered reason was pretext for unlawful discrimination. Instead, Dole explained that it paid such other individuals a higher rate because each had substantial prior experience in warehouse management, 22 and 33 years respectively, DeWitt Aff. ¶ 11; Lease Aff. ¶ 13, and plaintiff had none.  Pl. Dep. 225, Ex. 22.  Greater work experience is a legitimate, non-discriminatory reason for paying more experienced employees more than an employee in a protected class. Darden v. Housing Authority of Baltimore,  2006 WL 3231964, at *6 (D.Md. Nov. 7, 2006).[12]

There being absolutely no material issues in dispute, defendants are entitled to summary judgment on this claim.[13]

### G.    Plaintiff's Race Association Claims

In his Amended Complaint, plaintiff also contends that he was discharged and

---

[11]    Plaintiff cannot assert any claim under the Equal Pay Act because all warehouse supervisors were male.

[12]    Plaintiff's claim that he should have been compensated at supervisory pay between June 2006, when he was offered the job as supervisor, and September 2006, when commenced the job of supervisor, is without merit as it is clear that plaintiff was not offered or entitled to supervisory pay until he actually started work as a supervisor.

[13]    Plaintiff's equal work claim finds no support in either the summary judgment record or in the Amended Complaint as plaintiff has not made any plausible allegation that he was denied "equal work."

otherwise discriminated against not for violations of company policy or even lying to his employer; rather, he contends that he was discharged because he, as an African-American, "associated" with Caucasian women. Am. Compl. ¶ B(1).

In his deposition, plaintiff identified four Caucasian women with whom he allegedly associated. Pl. Dep. 240-41. The January 2008 written warning related to allegations of sexual harassment by one of these women and the termination related to another with whom plaintiff had a consensual relationship, which Dole perceived as violative of company policy and concerning which Dole perceived plaintiff had lied. Plaintiff has failed, however, to produce any evidence -- again, other than his own speculation -- that the race of either women played a role in either his discipline or termination. As to the other two Caucasian women, plaintiff has pointed to no adverse action taken by defendants of any sort.

In his Response, plaintiff argues that he "has consistently shown, throughout his response that associations between employees of the same race are not disciplined, investigated, or terminated due to their associations while Plaintiff was terminated for his interracial association/relationship with Ms. Hartness." Pl. Resp. Mem. at 58. As discussed earlier, where plaintiff's argument fails is that he has not shown that those involved in these alleged intra-racial couplings were similarly situated, or that any one was perceived by Dole as having lied to their employer when and if confronted about an *inappropriate* relationship. Plaintiff admits that at no point during his employment did any Dole manager make any comment regarding his dating of a Caucasian woman. Pl. Dep. pp. 243-245.

Summary judgment on this claim is also appropriate as plaintiff's speculation and conjecture is not sufficient to send this claim to a jury for decision.

## H. Plaintiff's Sex Discrimination Claim

In his Amended Complaint, plaintiff has also asserted a claim for discrimination based

on his sex, male. The claim fails from inception as plaintiff has failed to allege any plausible facts that would support finding differential treatment based on sex or gender with regard to his pay, the January 2008 written warning, plaintiff's performance evaluation, or plaintiff's September 2008 termination.

Instead, and for the time in this litigation, plaintiff argues in his response that heterosexual employees were treated differently than "same-sex employees." Pl. Resp. Mem. at 59. Plaintiff points to no homosexual relationship between a supervisor and a subordinate in the same department that was treated differently by management; he fails to identify any alleged homosexual employee accused of harassment and found to have behaved inappropriately, but who was not disciplined; and he has failed to identify any homosexual supervisor who was perceived to have lied to his or her employer and was not fired. The court will, therefore, grant summary judgment on this claim.

I.      **Plaintiff's Evaluation Claim**

Plaintiff asserts in his response that his 2007 and 2008 performance evaluations were "unwarranted," and "unjustified" because he "did not agree with the ratings and comments pertaining to his professionalism nor those pertaining to the 'perceptions of hourly employees.'" Pl. Resp. Mem. p. 25. Plaintiff also criticizes Mr. Lease's taking plaintiff's conduct towards M. G. into account in completing his 2007 performance review.

Plaintiff's disagreement with his ratings or the methodology used in reaching those evaluations is beyond the scope of Title VII, as the Civil Rights Act of 1964 is concerned with "*adverse* employment acts" by employers whose actions are motivated by unlawful considerations. Furr v. Seagate Tech., Inc., 82 F.3d 980, 988 (10th Cir.1996) ("[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance.") Evaluations and ratings cannot be reviewed

under Title VII as they, without more, do not amount to "adverse employment actions." This claim will be dismissed.

**J.      Dismissal of Claims Against Supervisory Employees**

Defendants Lease and DeWitt have been sued under Tile VII "in [their] official capacities," Am. Compl.; Pl. Dep. 236-238, which the court assumes is a suit against them as employees and or agents of Dole. Because an individual supervisor cannot be held liable under Title VII, <u>Lissau v. Southern Food Serv., Inc.</u>, 159 F.3d 177, 180 (4th Cir. 1998), the claims against Mr. Lease and Ms. DeWitt will be dismissed.

**K.      Plaintiff's Claim against Dole Food Company, Inc.**

Plaintiff has presented no evidence that Dole Food Company, Inc., was his employer at any time relevant to the issues in this case. To be a proper party under Title VII or its analogue under Section 1981, there must have been an "employment relationship" between plaintiff and defendant. <u>Bender v. Suburban Hospital, Inc.</u>, 159 F.3d 186, 189 (4th Cir. 1998). As such, the claims against such defendant will be dismissed with prejudice for failure to state a claim. The only defendant properly before this court under relevant case law is plaintiff's employer, Dole Fresh Vegetables, Inc.

**ORDER**

**IT IS, THEREFORE, ORDERED** that defendants' Motion for Summary Judgment (#69) is **GRANTED**, summary judgment is **ENTERED** in favor of defendants and against plaintiff, and this action is **DISMISSED** in its entirety with prejudice for the reasons herein discussed.

**IT IS FURTHER ORDERED** that Plaintiff's Second Motion in Limine to Exclude (#79) is **DENIED** as both premature and moot.

The Clerk of Court shall enter judgment accordingly.

<u>**Advice of Appellate Rights**</u>

In accordance with <u>Wilder v. Chairman of the Central Classification Bd.</u>, 926 F.2d 367, 371 (4th Cir.)("while not mandated, the preferable practice is to include a statement to all final orders involving *pro se* litigants setting forth the litigants' appellate rights"), <u>cert.</u> <u>denied</u>, 502 U.S. 832 (1991), plaintiff is hereby advised of the right to appeal this decision to the Court of Appeals of the Fourth Circuit in the manner described in Rule 3, Federal Rules of Appellate Procedure, by filing a Notice of Appeal with the Clerk of this Court within the time prescribed in Rule 4, Federal Rules of Appellate Procedure, which is **30 days** from entry of this Order. Failure to file a Notice of Appeal within the first 30-day period after entry of judgment requires the filing of a motion for extension of time and a notice of appeal within the second 30-day period after entry of judgment. Fed. R. App. P. 4(a)(5). <u>See</u> <u>United States ex rel. Leonard v. O'Leary</u>, 788 F.2d 1238, 1240 (7th Cir. 1986).

Signed: October 27, 2011

Max O. Cogburn Jr.
United States District Judge